## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOHN CORDOVA,**

      **Plaintiff,**

**vs.**                                                                 **No. _____**

**LEA COUNTY DETENTION CENTER,**
**LEA COUNTY, WARDEN RUBEN**
**QUINTANA in his individual capacity,**
**JOHN/JANE DOE CHIEF OF SECURITY FOR**
**LEA COUNTY DETENTION CENTER in**
**his/her individual capacity, LIEUTENANT**
**JOHEL MALDONADO in his individual**
**capacity, OFFICER JOE PORTILLO in his**
**individual capacity, OFFICER ERIC BLAND**
**in his individual capacity, and OFFICER**
**DILLON PHIPPS in his individual capacity,**

      **Defendants.**                                                 **JURY REQUESTED**


## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND
## VIOLATIONS OF THE NEW MEXICO TORT CLAIMS ACT

Plaintiff, John Cordova, brings this Complaint for civil rights violations pursuant to 42 U.S.C. §§ 1983 and 1988 and for violations of the New Mexico Tort Claims Act, NMSA 1978 § 41-4-1, et. seq. As grounds for this Complaint, Plaintiff alleges the following:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 1343.

2.      Venue is proper in this district as Defendant Lea County Detention Center is situated in New Mexico and all other Defendants and Plaintiff are residents of New Mexico.

3.      All acts complained of occurred in Lea County, New Mexico.

**PARTIES**

4.      Plaintiff John Cordova is a resident of Sandoval County, New Mexico.

5.      Defendant Lea County Detention Center ("LCDC") is a county jail that is owned and operated by Lea County, New Mexico.

6.      Defendant Lea County is a New Mexico county that owns and operates the Lea County Detention Center.

7.      Defendant Ruben Quintana ("Warden Quintana") was employed by Lea County as the warden of LCDC at all times material to this Complaint and is a resident of New Mexico.

8.      Defendant John/Jane Doe Chief of Security for LCDC ("Chief of Security") was employed by Lea County as the Chief of Security for LCDC at all times material to this complaint and is a resident of New Mexico.

9.      Lieutenant Johel Maldonado ("Lieutenant Maldonado") was employed by Lea County as a Lieutenant at LCDC at all times material to this Complaint and is a resident of New Mexico.

10.     Defendant Officer Joe Portillo ("Officer Portillo") was employed by Lea County as a corrections officer at LCDC at all times material to this complaint and is a resident of New Mexico.

11.     Defendant Officer Eric Bland ("Officer Bland") was employed by Lea County as a corrections officer at LCDC at all times material to this complaint and is a resident of New Mexico.

12.     Defendant Officer Dillon Phipps ("Officer Phipps") was employed by Lea County

a corrections officer at LCDC at all times material to this complaint and is a resident of New

Mexico.

### FACTUAL ALLEGATIONS

13.     Plaintiff, John Cordova, was an inmate at LCDC on April 29, 2017.  Mr. Cordova

had been arrested for an alleged probation violation, and had been booked into LCDC on April

25, 2017.

14.     No corrections officer was posted in housing unit DD at LCDC where Mr.

Cordova was housed.  Instead, corrections officers would check on the unit periodically.

15.      On April 29, 2017, at approximately 1744 pm, Officer Bland contacted Officer

Portillo to observe strange behavior that was occurring in housing unit DD at LCDC.

16.     Officer Bland was posted to the central control board watching video footage

from cameras in the housing units and had seen something in the DD housing unit that made him

ask Officer Portillo to investigate.

17.     In the DD housing unit, Officer Portillo observed inmates standing outside cell

#105 of the cells and heard someone say "Why did you punch that small dude in the face?"

18.     Officer Portillo and Officer Phipps walked through the DD housing unit and saw

an inmate, Christopher Sanders, in cell #104 with toilet paper stuck up his nose soaking up

blood.

19.     Officers Portillo and Phipps saw Plaintiff John Cordova in cell #105 acting

unusually and sweating profusely.  Officer Portillo asked Mr. Cordova to show him his fists.  Mr.

Cordova's knuckles on his right had appeared red and swollen.

20.     LCDC has a policy stating when an inmate assaults another inmate or engages in fighting, this is considered a major violation and one of the punishments is confinement in segregation for a minimum of sixty-nine (69) hours.

21.     Despite what they had seen and heard, neither Officer Portillo nor Officer Phipps removed Mr. Cordova and confined him to segregation as required by LCDC policy.

22.     Instead, Officer Portillo contacted Lieutenant Maldonado and told him about the fight between Mr. Cordova and Mr. Sanders.

23.     Officer Portillo also reported to Lieutenant Maldonado that there had been unusual movement in the housing unit for the last couple of days and that the inmates had not been acting like themselves and had been on edge.

24.     Lieutenant Maldonado did not order that Mr. Cordova be confined to segregation as required by LCDC policy even after Officer Portillo informed him that that Mr. Cordova had been in a fight with Mr. Sanders in the DD housing unit.

25.     One reason to remove inmates who have been involved in an assault is to protect them from retaliation from other inmates.

26.     This was particularly true in this case where Officers Portillo and Phipps had seen a group of inmates around Mr. Cordova's cell and heard them asking why he had punched Mr. Sanders.

27.     Lieutenant Maldonado also did not assign a corrections officer to the DD housing unit to keep a closer watch on the inmates.

28.     Lieutenant Maldonado was also aware that there had been unusual movement in the housing unit for the last couple of days and that the inmates had not been acting like themselves and had been on edge.

4

29.     Three hours later, at 2042, John Cordova was attacked by seven inmates in the DD housing unit.  These inmates savagely beat Mr. Cordova and repeatedly kicked him in the head.  They left him lying on the floor, unconscious, bleeding, with his arms and legs twitching.

30.     At the time of the attack, Officer Bland was talking on the phone and setting up a visit, rather than devoting his complete attention to observing what was happening in the jail.

31.     When Officer Bland noticed the attack, he called for assistance and several officers, including Lieutenant Maldonado, Officer Portillo, and Officer Phipps responded and went to assist in the DD housing unit.

32.     They found Mr. Cordova lying on the floor, unresponsive, covered in blood, with his arms and legs shaking.

33.     Officer Phipps and other officers placed Mr. Cordova in a wheelchair and transported him to medical.

34.     In medical, a nurse called EMS and an ambulance arrived and transported Mr. Cordova to Nor Lea Hospital at 2112.

35.     A corrections officer was sent to Nor Lea hospital with Mr. Cordova, but the medical staff at Nor Lea advised that Mr. Cordova's injuries were too serious to be treated at that that hospital, and he would need to be transported to a hospital in Lubbock, Texas.

36.     Warden Quintana directed Lieutenant Maldonado to contact another LCDC employee to get in touch with Mr. Cordova's probation officer to obtain authorization to release Mr. Cordova from LCDC custody by cancelling the warrant for Mr. Cordova's arrest for the alleged probation violation that caused him to be booked into LCDC.

37.     Mr. Cordova's probation officer cancelled the arrest warrant, and Mr. Cordova was officially released from LCDC custody.

38.     The officer who had escorted Mr. Cordova to Nor Lea Hospital returned to LCDC, and Mr. Cordova was transported to the hospital in Lubbock.

39.     Mr. Cordova was released, the warrant for his arrest was cancelled, and he never returned to LCDC after April 29, 2017.

40.     After leaving Nor Lea Hospital and being released from LCDC custody, Mr. Cordova was transported to University Medical Center in Lubbock, Texas where he was upgraded to a Level I trauma patient.

41.     There, he was diagnosed with a fractured skull, epidural and subdural hematomas, seizures, and a collapsed nasal bone.  He underwent surgery for his collapsed nose at University Medical Center.

42.     Mr. Cordova was discharged from University Medical Center in Lubbock, Texas on May 2, 2017.

43.     He was confused, dizzy, and experiencing headaches, so his family took him to the University of New Mexico Hospital ("UNMH") on May 3, 2017.

44.     He stayed at UNMH until May 5, 2017.  He was diagnosed with a traumatic brain injury, post-concussive disorder, and a frontoparietal subdural hematoma. He was given anti-seizure medication. While at UNMH, Mr. Cordova also exhibited difficulty with cognitive tasks such as finding his room, knowing where he was, knowing the date, and knowing his date of birth.  His gross motor skills including walking and balance were also very poor.  His speech, comprehension, and memory were impaired.  He also suffered from severe back pain.

45.     On May 5, 2017, Mr. Cordova was admitted to Lovelace Rehabilitation Hospital for acute inpatient rehabilitation therapy to treat his traumatic brain injury.  His treatment was to

help him regain the ability to engage in daily activities, help him with gross motor skills including walking, and his speech. He was discharged on May 19, 2017.

46.     Mr. Cordova has serious, permanent damage from the assault on April 29, 2017, including, but not limited to, a traumatic brain injury, seizure disorder, difficulty walking, and memory impairment.

47.     Due to the seizure disorder Mr. Cordova has as a result of the attack on April 29, 2017 at LCDC, he has frequent seizures and, due to a seizure, fell and broke his jaw.

48.     The security staff at LCDC identified the seven inmates who attacked Mr. Cordova on April 29, 2017.  Three of these inmates had assaulted other inmates prior to attacking Mr. Cordova.

49.     Rider Arroyo, one of the inmates who attacked Mr. Cordova on April 29, 2017, had a history of assaulting other inmates.  On January 10, 2017, Mr. Arroyo had been one of several inmates who lured an inmate into a cell where they attacked him.  Mr. Arroyo was disciplined for this assault. On March 5, 2017, Mr. Arroyo had assaulted another inmate.  He was also disciplined for the March 5, 2017 assault.

50.     Isidro Campos, another inmate who attacked John Cordova on April 29, 2017, assaulted another inmate on January 10, 2017.  He was one of the inmates, along with Mr. Arroyo, who attacked an inmate after luring him into a cell where several inmates assaulted the inmate.  He was disciplined for this attack.

51.     Kevin Metcalf, another inmate who attacked John Cordova on April 29, 2017, assaulted another inmate on March 13, 2017. He and a group of other inmates attacked an inmate who was in restraints and was accompanied by a corrections officer. Mr. Metcalf was disciplined for this assault.

52.     These inmates had a track record of assaulting other inmates.

53.     Additionally, given their histories of attacking other inmates, Lieutenant Maldonado, should have recognized that leaving Mr. Cordova in the DD housing unit with these dangerous inmates without a corrections officer in the housing unit placed Mr. Cordova in an unreasonably dangerous situation.

54.     Two other inmates who attacked Mr. Cordova, Marcos Martinez and Joel Martinez, were federal inmates who were being held in LCDC.

55.     The federal detainees should not have been housed with the county detainees including Mr. Cordova.

56.     Mr. Cordova was arrested and detained at the Sandoval County Detention Center on July 25, 2018.

57.     While detained at the Sandoval County Detention Center, Mr. Cordova mailed three grievances to LCDC regarding his brutal attack on April 29, 2017.

58.     LCDC never responded to his grievances.

## CAUSES OF ACTION

### CLAIM I
**Violation of the Eighth or, in the Alternative, Fourteenth Amendment of the United States Constitution Pursuant to 42 U.S.C. § 1983**
**(Officer Bland, Officer Portillo, Officer Phipps, and Lieutenant Maldonado)**

59.     Plaintiff incorporates by reference the preceding paragraphs as though they were stated fully herein.

60.     The constitutional protection against cruel and unusual punishment for pretrial detainees applies through the due process clause of the Fourteenth Amendment.

8

61.     The constitutional protection against cruel and unusual punishment for people who have been convicted of crimes applies through the Eighth Amendment and applies to the states via the Fourteenth Amendment.

62.     If the Court determines that Plaintiff was a pre-trial detainee at the time of the incident, then his Fourteenth Amendment rights were violated by Defendants Officer Portillo, Officer Phipps, Officer Bland, and Lieutenant Maldonado when they failed to protect him from violence at the hands of other inmates at LCDC.  Alternatively, if the Court determines that Plaintiff had been convicted of a crime at the time of the incident, then his Eighth Amendment rights were violated by Defendants when they failed to protect him from violence at the hands of other inmates at LCDC.

63.     Officers Bland, Portillo, Phipps, and Lieutenant Maldonado knew Plaintiff had been involved in a fight with another inmate, Christopher Sanders, a few hours before Plaintiff was attacked.

64.     Officers Portillo and Phipps saw that Mr. Sanders had a bloody nose, and that Plaintiff had red, swollen knuckles and was behaving nervously.

65.     Officers Portillo, Phipps, and Bland also saw a group of inmates gathered outside Plaintiffs' cell door, and Officers Portillo and Phipps heard the inmates ask Plaintiff "Why did you punch that small dude in the face?"

66.     Officer Portillo reported all of this information to Lieutenant Maldonado.

67.     None of these officers followed LCDC policy that required them to remove Plaintiff from the housing unit and place him in segregation for at least 69 hours.

68.     None of these officers remained in the housing unit following the fight between Plaintiff and Mr. Sanders.

69.     Lieutenant Maldonado did not order any corrections officer(s) be posted in the housing unit despite the fact that Officer Portillo reported the fight between Mr. Sanders and Plaintiff to him and also told him that there had been unusual movement in the housing unit for the last couple of days and that the inmates had not been acting like themselves and had been on edge.

70.     Officers Portillo, Bland, Phipps and Lieutenant Maldonado were all aware of the unreasonably dangerous conditions in the housing unit and the dangers to Mr. Cordova, knew these conditions posed a serious risk to Mr. Cordova, and acted with deliberate indifference to Mr. Cordova's safety.

71.     As a result of this deliberate indifference to the known risks to Mr. Cordova, he was attacked and severely beaten by seven other inmates.

72.     Mr. Cordova was seriously, and permanently injured as result of this attack.

73.     Defendants acted with a callous disregard and with deliberate indifference to Mr. Cordova's safety.

## CLAIM II
### Violation of the Eighth or, in the Alternative, Fourteenth Amendment of the United States Constitution Pursuant to 42 U.S.C. § 1983 (Warden Quintana and the Chief of Security for LCDC)

74.     Plaintiff incorporates by reference the preceding paragraphs as though they were stated fully herein.

75.     The constitutional protection against cruel and unusual punishment for pretrial detainees applies through the due process clause of the Fourteenth Amendment.

76.     The constitutional protection against cruel and unusual punishment for people who have been convicted of crimes applies through the Eighth Amendment and applies to the states via the Fourteenth Amendment.

10

77.     If the Court determines that Plaintiff was a pre-trial detainee at the time of the
incident, then his Fourteenth Amendment rights were violated by Defendants Warden Quintana
and the Chief of Security when they failed to protect him from violence at the hands of other
inmates at LCDC.  Alternatively, if the Court determines that Plaintiff had been convicted of a
crime at the time of the incident, then his Eighth Amendment rights were violated by Defendants
when they failed to protect him from violence at the hands of other inmates at LCDC.

78.     Warden Quintana and the Chief of Security were responsible for operating a jail
that protects inmates from known dangers to inmates.

79.     Warden Quintana and the Chief of Security knew that failing to remove an inmate
who had been fighting from a housing unit was unreasonably dangerous and they knew that they
had a policy requiring removal and segregation for inmates had had been fighting to prevent the
dangers posed by permitting these inmates to remain in the housing unit after an altercation.

80.     Despite this known danger, Warden Quintana the Chief of Security failed to
enforce their policies including requiring inmates involved in an assault or who were fighting to
be removed from the housing unit and placed in segregation for at least 69 hours.

81.     Upon information and belief, Warden Quintana the Chief of Security also failed
to train staff on their policies causing dangerous conditions within LCDC.

82.     Warden Quintana and the Chief of Security were aware that they needed adequate
staffing in the jail to ensure that the inmates were properly supervised to prevent them from
hearing each other.

83.     Despite this knowledge, Warden Quintana and the Chief of Security failed to
ensure that there was adequate staffing to supervise inmates at LCDC to prevent them from
harming each other.

11

84.     Warden Quintana and the Chief of Security knew that when dangerous conditions existed in a housing unit, they must increase supervision in this housing unit to ensure the safety of the inmates.

85.     Upon information and belief, despite this knowledge, Warden Quintana and the Chief of Security did not promulgate policies, procedures, or provide training necessary to ensure that supervision was increased when there was trouble in a housing unit.

86.     Warden Quintana and the Chief of Security knew that corrections officers monitoring cameras in the housing units must focus on monitoring the housing units for dangerous conditions.

87.     Despite this knowledge, Warden Quintana and the Chief of Security allowed the officers monitoring the cameras to also answer phone calls and schedule visitations.

88.     Warden Quintana and the Chief of Security knew that inmates with a history of assaulting other inmates posed a danger to the other inmates with whom they were housed.

89.     Despite this knowledge, Warden Quintana and the Chief of Security failed to promulgate policies, procedures, or provide training necessary to ensure that dangerous inmates were kept away from other inmates.

90.     Warden Quintana and the Chief of Security knew that federal inmates should not be housed with county inmates to protect their safety.

91.     Despite this knowledge, Warden Quintana and the Chief of Security failed to promulgate policies, procedures, or provide training necessary to ensure that federal inmates and county inmates were detained separately.

92.     Warden Quintana and the Chief of Security's above-listed failures caused unreasonably dangerous conditions in the jail and to Mr. Cordova, they knew these conditions

posed a serious risk to the inmates in the jail, including Mr. Cordova, and they acted with

deliberate indifference to the inmates' safety.

93.    As a result of this deliberate indifference to the known risks to inmates at LCDC,

including Mr. Cordova, Plaintiff was attacked and severely beaten by seven other inmates.

94.    Mr. Cordova was seriously, and permanently injured as result of this attack.

95.    Defendants acted with a callous disregard and with deliberate indifference to the

safety of the inmates at LCDC including Mr. Cordova.

### CLAIM III
**Violation of the Eighth or, in the Alternative, Fourteenth Amendment of the
United States Constitution Pursuant to 42 U.S.C. § 1983
(Government Liability of Lea County and Lea County Detention Center)**

96.    Plaintiff incorporates by reference the preceding paragraphs as though they were

stated fully herein.

97.    The constitutional protection against cruel and unusual punishment for pretrial

detainees applies through the due process clause of the Fourteenth Amendment.

98.    The constitutional protection against cruel and unusual punishment for people

who have been convicted of crimes applies through the Eighth Amendment and applies to the

states via the Fourteenth Amendment.

99.    If the Court determines that Plaintiff was a pre-trial detainee at the time of the

incident, then his Fourteenth Amendment rights were violated by Defendants Lea County and the

Lea County Detention Center when they failed to protect him from violence at the hands of other

inmates at LCDC.  Alternatively, if the Court determines that Plaintiff had been convicted of a

crime at the time of the incident, then his Eighth Amendment rights were violated by Defendants

when they failed to protect him from violence at the hands of other inmates at LCDC.

100.    Lea County and the Lea County Detention Center were responsible for operating a jail that protects inmates from known dangers to inmates.

101.    Lea County and the Lea County Detention Center had a policy requiring removal and segregation for inmates who had been fighting to prevent the dangers posed by permitting these inmates to remain in the housing unit after an altercation.

102.    Lea County and the Lea County Detention Center had a policy, practice, and custom of failing to enforce their policies, including requiring inmates involved in an assault or who were fighting to be removed from the housing unit and placed in segregation for at least 69 hours.

103.    Upon information and belief, Lea County and the Lea County Detention Center also has a policy, practice, and custom of failing to train staff on their policies which caused dangerous conditions within LCDC.

104.    Lea County and the Lea County Detention Center had a policy, practice, and custom of failing to ensure that there was adequate staffing to supervise inmates at LCDC to prevent them from harming each other.

105.    Upon information and belief, Lea County and the Lea County Detention Center did not have sufficient policies, procedures, or provide training necessary to ensure that supervision was increased when there was trouble in a housing unit.

106.    Lea County and the Lea County Detention Center had a policy, practice, and custom of allowing the officers monitoring the cameras to also answer phone calls and schedule visitations when they should have been focused on monitoring the housing units.

107.    Lea County and the Lea County Detention Center did not have sufficient policies, procedures, or provide training necessary to ensure that dangerous inmates were kept away from other inmates.

108.    Lea County and the Lea County Detention Center did not have sufficient policies, procedures, or provide training necessary to ensure that federal inmates and county inmates were detained separately.

109.    Lea County and the Lea County Detention Center's policies, practices, and customs, and lack of sufficient policies, procedures and training caused unreasonably dangerous conditions in the jail and to Mr. Cordova and constitute deliberate indifference to the inmates' safety.

110.    Upon information and belief, Lea County and the Lea County Detention Center failed to adequately supervise their employees causing unreasonably dangerous conditions in the jail and to Mr. Cordova and constitute deliberate indifference to the inmates' safety.

111.    Upon information and belief, Lea County and the Lea County Detention Center hired and promoted employees who were not qualified to perform their jobs causing unreasonably dangerous conditions in the jail and to Mr. Cordova and constitute deliberate indifference to the inmates' safety.

112.    Upon information and belief, Lea County and the Lea County Detention Center retained employees who were not qualified to perform their jobs causing unreasonably dangerous conditions in the jail and to Mr. Cordova and constitute deliberate indifference to the inmates' safety.

113.    As a result of this deliberate indifference to the known risks to inmates at LCDC, including Mr. Cordova, Plaintiff was attacked and severely beaten by seven other inmates.

114.     Mr. Cordova was seriously, and permanently injured as result of this attack.

115.     Defendants acted with a callous disregard and with deliberate indifference to the safety of the inmates at LCDC including Mr. Cordova.

**CLAIM IV**
**Negligent Operation of a Building in**
**Violation of the New Mexico Tort Claims Act, NMSA 1978 § 41-4-1 et. seq.**
**(All Defendants)**

116.     Plaintiff incorporates by reference the preceding paragraphs as though they were stated fully herein.

117.     Defendants had duty to maintain the safety of LCDC for the inmates housed in the facility.

118.     Defendants negligently operated and maintained LCDC by failing to remove Plaintiff from the housing unit and segregate Plaintiff per their policy after he was involved in a fight with another inmate just a few hours before he was attacked and beaten by seven other inmates.

119.     Defendants negligently operated and maintained LCDC by failing to adequately staff the facility.

120.     Defendants negligently operated and maintained LCDC by failing to increase supervision or post a corrections officer in Mr. Cordova's housing unit after he had been involved in a fight with another inmate just a few hours before he was attacked and beaten by seven other inmates despite the fact they knew about the altercation, they had seen other inmates gathering outside of Mr. Cordova's cell, they had heard other inmates asking why he had punched another inmates, and they had observed unusual behavior and high tension in the housing unit prior to Mr. Cordova being attacked.

16

121.    Defendants negligently operated and maintained LCDC by allowing inmates who had a history of assaulting other inmates to be housed with other inmates despite the danger they posed to the other inmates.

122.    Defendants negligently operated and maintained LCDC by failing to segregate federal and county detainees.

123.    Defendants negligently operated and maintained LCDC by allowing the corrections officers who monitored the cameras in the housing units to answer telephone calls and schedule visitations when they should have been focusing on monitoring the housing units.

124.    As a direct and proximate results of Defendants' negligent operation of LCDC, Plaintiff was attacked and beaten by other inmates at LCDC.

125.    As a result of this attack, Mr. Cordova suffered serious and permanent injuries.

**CLAIM V**
**Liability of Law Enforcement Officers in**
**Violation of the New Mexico Tort Claims Act, NMSA 1978 § 41-4-1 et. seq.**
**(All Defendants)**

126.    Plaintiff incorporates by reference the preceding paragraphs as though they were stated fully herein.

127.    At all times material to this Complaint, Defendants were law enforcement officers pursuant to the New Mexico Tort Claims Act.

128.    At all times material to this Complaint, Defendants were acting within the scope of their duties.

129.    Defendants caused Plaintiff's assault and battery by failing to remove and segregate Plaintiff per LCDC policy after he was involved in a fight with another inmate just a few hours before he was attacked and beaten by seven other inmates.

17

130.    Defendants caused Plaintiff's assault and battery by failing to adequately staff the facility.

131.    Defendants caused Plaintiff's assault and battery by failing to increase supervision or post a corrections officer in Mr. Cordova's housing unit after he had been involved in a fight with another inmate just a few hours before he was attacked and beaten by seven other inmates despite the fact they knew about the altercation, they had seen other inmates gathering outside of Mr. Cordova's cell, they had heard other inmates asking why he had punched another inmates, and they had observed unusual behavior and high tension in the housing unit prior to Mr. Cordova being attacked.

132.    Defendants caused Plaintiff's assault and battery by allowing inmates who had a history of assaulting other inmates to be housed with other inmates despite the danger they posed to the other inmates.

133.    Defendants caused Plaintiff's assault and battery by failing to segregate federal and county detainees.

134.    Defendants caused Plaintiff's assault and battery by allowing the corrections officers who monitored the cameras in the housing units to answer telephone calls and schedule visitations when they should have been focusing on monitoring the housing units.

135.    As a direct and proximate results of Defendants' negligence, Plaintiff was attacked and beaten by other inmates at LCDC.

136.    As a result of this attack, Mr. Cordova suffered serious and permanent injuries.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff, John Cordova, respectfully requests that the Court enter judgment in his favor, including:

1.     Awarding damages in an amount the jury deems sufficient to compensate Plaintiff for the nature, extent, and duration of his injuries;

2.     Awarding damages in an amount a jury deems sufficient to compensate Plaintiff for Defendants' unlawful conduct;

3.     Punitive damages in an amount a jury deems sufficient to deter Defendants and other jails and jail employees from acting with deliberate indifference to the rights and safety of Plaintiff and others;

4.     Awarding reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1983 and 1988;

5.     Awarding pre-and post-judgment interest; and

6.     For such other and further relief as the Court deems just.

## JURY DEMAND

Plaintiff respectfully demands a jury on all issues so triable.  This demand is proper pursuant to Fed. R. Civ. Proc. 38 and the Seventh Amendment of the United States Constitution.

Respectfully submitted,

LAW OFFICE OF ALEXANDRA FREEDMAN SMITH, LLC
/s/ Alexandra Freedman Smith
Alexandra Freedman Smith
925 Luna Circle NW
Albuquerque, NM 87102
Phone: 505.314.8884; Fax: 505.835.5658
asmith@smith-law-nm.com

LAW OFFICE OF FRANCES CROCKETT
Frances C. Carpenter
925 Luna Circle NW
Albuquerque, NM 87102
Phone: (505) 314-8883; Fax: (505) 835-5658

*Attorneys for Plaintiff*